UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | Chapter 7 |
| ) | |
| marchFIRST, INC., *et al.*, ) | No. 01 B 24742 |
| ) | (substantively consolidated) |
| Debtors. ) | |
| ) | |
| ) | |
| ANDREW J. MAXWELL, trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 09 A 104 |
| ) | |
| NOVELL, INC., ) | |
| ) | |
| Defendant. ) | Judge Goldgar |

## MEMORANDUM OPINION

This matter is before the court for ruling on the motion of plaintiff Andrew J. Maxwell, chapter 7 trustee, for judgment on the pleadings on Count I of his adversary complaint against defendant Novell, Inc. In that count, Maxwell alleges that Novell's Claim No. 4524 is a claim for damages arising from the purchase or sale of a security of debtor marchFirst, Inc. and therefore must be subordinated to all senior or equal claims pursuant to section 510(b) of the Bankruptcy Code, 11 U.S.C. § 510(b). For the reasons that follow, Maxwell's motion will be granted.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B).

## 2. Background

### a. Rule 12(c) Standards

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to "move for judgment on the pleadings" once the pleadings are closed. Fed. R. Civ. P. 12(c) (made applicable by Fed. R. Bankr. P. 7012(b)). The standard for judgment on the pleadings is often said to be the dismissal standard under Rule 12(b)(6). *See, e.g., Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). *Alexander v. City of Chicago*, 994 F.2d 333 (7th Cir. 1993), however, explains that the Rule 12(b) standard applies only when a defendant uses Rule 12(c) to raise Rule 12(b) defenses. *Id.* at 336. When a party invokes Rule 12(c) to dispose of a case on "the underlying substantive merits," the summary judgment standard applies. *Id.* Thus, judgment on the pleadings may be granted if there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *Id.*; *see, e.g., Robert W. Karr & Assocs., Ltd. v. Novoselsky*, No. 08 C 1197, 2008 WL 4865573, at *2 (N.D. Ill. July 14, 2008).

In determining the presence of factual issues on a Rule 12(c) motion, the court "may consider only the contents of the pleadings." *Alexander*, 994 F.2d at 336. The "pleadings" means "the complaint, the answer, and any written instruments attached as exhibits" under Rule 10(c). *Northern Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). A "written instrument" for purposes of Rule 10(c) includes "documents such as affidavits and letters, as well as contracts and loan documentation." *Id.* at 453 (internal citations omitted). Also fair game are matters of public record of which the court can take judicial notice. *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991).

### b. Facts

The following facts are drawn from the pleadings and are not contested, either because they are admitted in Novell's answer or because they are subject to judicial notice.[1]

### i. The Purchase Agreement and the Alliance Agreement

Whittman-Hart, Inc. ("WH") was a provider of consulting services in information technology. (Compl. Ex. 1, Supp. Doc. B ¶ 2). Novell is a major provider of software used to manage computer networks. (*Id.* ¶ 3). One of its products was "Novell Directory Services" ("NDS"), a form of network software designed for businesses. (*Id.*). In 1999, WH and Novell negotiated a business alliance under which they would cross-market their services and develop, market, and implement technology solutions and consulting services based on the strategic use of NDS and related technologies. (Compl. ¶ 18; Answer ¶ 18).

To implement their alliance, WH and Novell entered into two agreements on September 29, 1999. (Compl. ¶ 19; Answer ¶ 19). Under the first, the Common Stock and Warrant Purchase Agreement (the "Purchase Agreement"), WH agreed to issue and sell to Novell more than three million shares of WH common stock in exchange for $100 million. (Compl. ¶ 27; Answer ¶ 27). WH also agreed to issue to Novell at closing warrants to purchase up to 400,000 additional shares. (*Id.*). The Purchase Agreement required WH to use the proceeds of the stock

---

[1] Some facts are uncontested because Novell has expressly admitted them in its answer. Others are uncontested because Novell has admitted them by responding to allegations about documents that the document "speaks for itself." That response is not one of the three alternatives Rule 8(b) permits. *See* Fed. R. Civ. P. 8(b) (made applicable by Fed. R. Bankr. P. 7008(a)); *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, No. 99 C 5153, 1999 WL 1269199, at *1 (N.D. Ill. Dec. 23, 1999) ("This Court has been listening to such materials for years . . . in the forlorn hope that one will indeed give voice . . . ."). Allegations to which Novell has given this non-answer are deemed admitted.

-3-

sale to fund the development, promotion, and implementation of an "NDS Solutions Practice," a term defined in the second agreement between WH and Novell. (Compl. ¶ 28; Answer ¶ 28).

Under the second agreement, the Global Alliance Agreement (the "Alliance Agreement"), WH and Novell spelled out their obligations to develop "a leading worldwide NDS consulting organization that offers a comprehensive set of NDS-based products, services and solutions" and to develop, market, and implement an "NDS Solutions Practice."[2] (Compl. ¶ 20; Answer ¶ 20). As the Purchase Agreement did, the Alliance Agreement made clear that the proceeds from the sale of WH stock to Novell would fund, among other things, the costs WH incurred in fulfilling its obligations under the Alliance Agreement. (Compl. ¶¶ 20, 21; Answer ¶¶ 20, 21). The Alliance Agreement also contained a limitation of liability clause that excluded the recovery of indirect, special, reliance, and consequential damages, "whether in a contract, tort or other action," to the maximum extent allowed by law. (Compl. ¶ 22; Answer ¶ 22).

Some time between mid-November and mid-December 1999, the Purchase Agreement closed.[3] Novell paid $100 million to WH. (*See* Compl. Ex. 1 at 3). WH, in turn, issued its common stock to Novell.[4]

---

[2] An "NDS Solutions Practice" is defined as "a consulting services business based on the development, promotion and implementation of NDS Solutions to middle-market companies and divisions and departments of Fortune 500 companies." (*See* Compl. Ex. 1, Supp. Doc. B at 2, ¶ 1(*l*)).

[3] The complaint does not allege a closing date, but the closing could not occur until the parties had executed a separate Investor Rights Agreement (*see* Compl. Ex. 1, Supp. Doc. A at 18, ¶ 5(*l*)), and the Investor Rights Agreement was not executed until November 12, 1999 (Compl. ¶ 33; Answer ¶ 33). According to Novell, meanwhile, the closing occurred "a few days" before WH announced its merger with USWeb/CKS (*see* Compl. Ex. 1 at 3), and it appears the merger was announced in mid-December 1999 (*see* Compl. Ex. 6 at 2).

[4] Surprisingly, Novell denies that it actually acquired the stock. (*See* Answer ¶ 61). There is no question, however, that the Purchase Agreement closed, and the Purchase Agreement

Shortly after the closing, WH announced its intent to merge with USWeb/CKS ("USWeb") an internet consulting business. (*See* Compl. Ex. 1 at 3). Novell was not told of the pending merger either before or at the closing. (*Id.*). At the time, Novell considered Microsoft a major competitor (Compl. ¶ 46; Answer ¶ 46), and USWeb was, in Novell's words, a "very pro-Microsoft and anti-Novell consulting business" (Compl. Ex. 1 at 3). Although Novell made public statements after the merger suggesting that its partnership with WH -- by then called "marchFirst, Inc." -- was nonetheless a strong one with immense potential (Compl. ¶¶ 50, 51, 57; Answer ¶¶ 50, 51, 57), Novell was plainly displeased (Compl. Ex. 1 at 3). Had Novell known of the pending merger, it would not have purchased $100 million in WH stock. (*Id.*). Moreover, marchFirst made little or no effort to meet its obligations under the Alliance Agreement despite Novell's investment of $100 million. (*Id.*).

### ii. marchFirst's Bankruptcy and Novell's Claims

In April 2001, marchFirst and its subsidiaries filed petitions for relief under chapter 11 of the Bankruptcy Code. (Compl. ¶ 1; Answer ¶ 1). The cases were converted to cases under chapter 7, and Maxwell was appointed trustee. (Compl. ¶¶ 2, 4; Answer ¶¶ 2, 4). In June 2001, the court entered an order setting October 11, 2001, as the deadline for creditors to file claims against the estates. (Compl. ¶ 5; Answer ¶ 5).

On October 11, 2001, the bar date, Novell filed a proof of claim ("Claim No. 4524") for $100 million. (Compl. ¶¶ 6, 7; Answer ¶¶ 6, 7; *see* Compl. Ex. 1). Attached to Claim No. 4524 was a typed page with a section entitled "Basis of Claim." In that section, Novell described how

---

required WH at closing to "issue and sell" the stock to Novell. (Compl. Ex. 1, Supp. Doc. A at 1, ¶ 1(b)).

it came to enter into the Purchase and Alliance Agreements and pay $100 million to WH. (Compl. Ex. 1 at 3). Novell then described the WH merger with USWeb, said that it had not known of the pending merger, and added that if had it had known of the merger, it would not have paid the $100 million. (*Id.*). "As a direct and proximate result of marchFirst's fraud," Novell contended it had "been injured and suffered damages in the amount of $100,000,000.00, plus interest and fees as allowed by law." (*Id.*). Also attached to Claim No. 4524 as supporting documents were copies of the Purchase and Alliance Agreements. (Compl. Ex. 1, Supp. Docs. A, B).

Novell also filed a second proof of claim on the bar date, this one for $1.19 million ("Claim No. 4525"). Attached to Claim No. 4525 was a typed page with a section entitled "Basis of Claim."[5] In that section, Novell recounted its entry into the Alliance Agreement with WH and stated that marchFirst had "breached its obligations under the Alliance Agreement." As "a direct and proximate result" of the breach, Novell said, it had suffered damages of "at least $1,190,000.00," and Novell itemized the known damages.[6] Also attached to Claim No. 4525 as a supporting document was a copy of the Alliance Agreement.

---

[5] Claim No. 4525 is not attached to Maxwell's complaint, but the court can take judicial notice of claims in its claims register. *See In re Gulley*, 400 B.R. 529, 532 n.1 (Bankr. N.D. Tex. 2009); *In re Daniels*, 362 B.R. 428, 436 (Bankr. S.D. Iowa 2007); *In re Townsville*, 268 B.R. 95, 99 n.3 (Bankr. E.D. Pa. 2001).

[6] Novell claimed lost revenues of $300,000 from marchFirst's failure "to globally deploy, use and maintain NDS Solutions" and "to engage Novell Consulting Services in the internal implementation of NDS Solutions," lost revenues of $280,000 from marchFirst's failure "to cause a minimum of 600 of its employees to be trained and certified as Certified Directory Engineers," and damages of $610,000 from marchFirst's failure to "staff, equip and operate" three NDS Solutions Centers.

### iii. Maxwell's Adversary Proceeding and Motion

In February 2009, Maxwell filed a two-count adversary complaint against Novell. In Count I, Maxwell alleged that Claim No. 4524 was a claim for damages arising from the purchase or sale of a security of the debtor under section 510(b) of the Bankruptcy Code. Maxwell therefore requested a judgment subordinating Claim No. 4524 to all senior or equal claims. In Count II, Maxwell alleged "on information and belief" that Novell had described Claim No. 4524 as a claim based on marchFirst's misuse of the $100 million paid under the Purchase Agreement, that such a claim would "in essence" be one for breach of the Alliance Agreement, and that the Alliance Agreement's limitation of liability provision barred any recovery of damages. Maxwell accordingly sought a judgment disallowing the claim.

Novell answered the complaint, and Maxwell immediately moved for judgment on the pleadings on Count I. In its response to the motion, Novell conceded that it had purchased shares of the debtor and also conceded that if Claim No. 4524 had concerned the purchase, the claim would be subordinated under section 510(b). (Adv. Dkt. No. 16 at 2). Novell made the same concession at an October 14 status hearing after the completion of briefing on Maxwell's motion, acknowledging again that a claim for rescission of the stock purchase would have to be subordinated. (*See* Tr. of Oct. 14, 2009, at 3-4, attached as Ex. 2 to Adv. Dkt. No. 38). Given these concessions, there seemed to be no issue for the court to decide, and the parties were encouraged to reach some kind of agreement. (*Id.* at 7-8, 12).

At the next status hearing, however, the parties reported no agreement had been reached. (Tr. of Nov. 18, 2009, at 2, attached as Ex. 3 to Adv. Dkt. No. 38). The sticking point was the interpretation of Claim No. 4524: Novell conceded that *if* the claim concerned the stock

purchase, it would have to be subordinated, but Novell disagreed that the claim concerned the stock purchase. The claim, Novell contended, was really one for damages in connection with the breach of the Alliance Agreement. (*Id.* at 5, 6-7).[2] Not surprisingly, Maxwell (along with another creditor, JP Morgan Chase Bank, N.A.) disagreed, insisting that the claim could only be read as a claim for return of the $100 million investment. (*Id.* at 4, 9).

Because the briefing to date had addressed only the subordination of Claim No. 4524 under section 510(b), the court requested supplemental briefing on the proper interpretation of the claim. (*Id.* at 6, 9). Chase Bank was allowed to intervene in the adversary proceeding (Adv. Dkt. Nos. 25, 37) and submitted a brief in support of Maxwell (Adv. Dkt. No. 26). The matter is fully briefed and ready for decision.

### 3. Discussion

The Bankruptcy Code pays the claims of creditor according to a statutory priority under which claims of the same class are ordinarily paid *pro rata*. Subordination "alters the otherwise applicable priority of a claim," placing a subordinated claim behind other claims of the same class. *SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP)*, 579 F.3d 411, 417 (5th Cir. 2009). Section 510(b) of the Code subordinates a claim for, among other things, "damages arising from the purchase or sale of" a "security of the debtor or of an affiliate of the debtor," forcing that claim to be paid after "all claims or interests that are senior to or equal" the

---

[2] Novell took this position at the October 14 status hearing as well: "Mr. Leta: If this claim were a claim for rescission of the stock purchase, it would be subordinated. . . . But that's not what our claim is about here. That's not the remedy that we're seeking. . . . What we are seeking are damages . . . for the breach of the contract to go forward and perform and actually implement the strategic alliance between Novell and Whit[t]man-Hart. . . ." (Tr. of Oct. 14, 2009, at 3-4, 5, attached as Ex. 2 to Adv. Dkt. No. 38; *see also id.* at 8).

subordinated claim. 11 U.S.C. § 510(b).[8/] The provision implements a general principle of bankruptcy law "that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets," *Racusin v. American Wagering, Inc. (In re American Wagering, Inc.)*, 493 F.3d 1067, 1071 (9th Cir. 2007), because shareholders assume the risk of business failure in a way creditors do not, *In re Telegroup, Inc.*, 281 F.3d 133, 141 (3d Cir. 2002). Section 510(b) thus prevents "disappointed shareholders, sometimes the victims of corporate fraud, from recouping their investment in parity with unsecured creditors." *American Wagering*, 493 F.3d at 1071-72.

In this case, the parties agree that a claim for damages arising from the purchase or sale of a security of the debtor must be subordinated to all senior or equal claims. They also agree that Novell's Claim No. 4524 must be subordinated if the claim is one for damages arising from the purchase or sale of a security of the debtor in this case. The only question, then, is what sort of claim Novell is asserting in Claim No. 4524. That, in turn, raises the question of how to determine what claim a proof of claim asserts.

The Bankruptcy Code and Rules give no real guidance. Section 501(a) of the Code simply allows a creditor to file "a proof of claim," 11 U.S.C. § 501(a), without defining the term. Rule 3001(a) does better, stating that a proof of claim is "a written statement setting forth a creditor's claim." Fed. R. Bankr. P. 3001(a). The Rule adds that a proof of claim "shall conform substantially to the appropriate Official Form." *Id.* Official Form 10, the proof of claim form,

---

[8/]     Section 510(b) subordinates three kinds of claims: "'(1) an actual attempt to rescind a purchase or sale of a security issued by the debtor or one of its affiliates; (2) a claim for damages arising from a purchase or sale of a security; and (3) a claim for reimbursement or contribution for a purchase or sale of such a security under section 502 of the Code.'" *Weissmann v. Pre-Press Graphics Co. (In re Pre-Press Graphics Co.)*, 307 B.R. 65, 71 (N.D. Ill. 2004) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir. 2002)). In Count I of his complaint, Maxwell alleges only that Novell's claim is for damages arising from the purchase or sale of a security.

requires a claimant to state the "basis" for the claim. *See* Off. Bankr. Form 10. But the instructions accompanying Form 10 say only that to provide the basis for the claim means to "[s]tate the type of debt or how it was incurred." *Id.*

The case law, however, provides a gloss on the Code and Rules. The purpose of proofs of claim, courts have explained, is "'to alert the court, trustee, and other creditors, as well as the debtor, to claims against the estate.'" *Adair v. Sherman*, 230 F.3d 890, 896 (7th Cir. 2000) (quoting *International Bus. Machs. v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 731, 734 (7th Cir. 1991)). A proof of claim must therefore be "sufficiently specific" to give "notice" of the claim.[9] *Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 777 (2d Cir. 1996); *see also Gens v. Resolution Trust Corp.*, 112 F.3d 569, 575 (1st Cir. 1997) (proof of claim must give "adequate notice of the existence, nature, and amount of the claim"); *In re O'Malley*, 252 B.R. 451, 456 (Bankr. N.D. Ill. 1999); *In re Rimsat, Ltd.*, 223 B.R. 345, 348 (Bankr. N.D. Ind. 1998) (creditor must "provide some kind of factual context" for the debtor's liability); *In re Grocerland Coop., Inc.*, 32 B.R. 427, 437 (Bankr. N.D. Ill. 1983) (proof of claim must supply "facts of sufficient particularity" to put parties on notice).[10]

---

[9] Because a proof of claim is often compared to a complaint in a civil action, *see, e.g., Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995); *In re Handy Andy Home Improvement Ctrs., Inc.*, 222 B.R. 571, 573 (Bankr. N.D. Ill. 1998), some courts derive this notice standard by analogy to Rule 8(a) of the Federal Rules of Civil Procedure, acknowledging at the same time that the analogy is not perfect, *see, e.g., O'Malley*, 252 B.R. at 456 (noting that a proof of claim need not actually satisfy Rule 8(a)); *Rimsat*, 223 B.R. at 348. Other courts, though, have gone beyond analogy and applied Rule 8(a) (and even Rule 9(b)) directly to proofs of claim. *See, e.g., In re DJK Residential, LLC*, 416 B.R. 100, 106-07 (Bankr. S.D.N.Y. 2009); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 542 n.17 (Bankr. S.D.N.Y. 2000).

[10] A few decisions require simply that a proof of claim "allege facts sufficient to support the claim" without mentioning notice or any other standard by which sufficiency might

The treatment of claim amendments proposed after the claims bar date illustrates that proofs of claim are held to a notice standard. Either directly or by analogy, courts faced with these amendments evaluate them under Rule 15(c) of the Federal Rules of Civil Procedure, which permits a complaint to be amended if the facts remain the same and have "been brought to [the] defendant's attention by" the original complaint, *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001). *See, e.g., Gens*, 112 F.3d at 575; *In re Alliance Operating Corp.*, 60 F.3d 1174, 1176 (5th Cir. 1995). A late amendment to a proof of claim will therefore be allowed only if, among other things, it is not "a veiled attempt to assert a distinctly new right to payment" but one to which the original claim "fairly alerted" the parties. *Gens*, 112 F.3d at 575 (internal quotation omitted); *see also Alliance*, 60 F.3d at 1176 (finding a "key factor" that the court "already have notice" of the "nature" of the claim); *Unioil, Inc. v. Elledge (In re Unioil, Inc.)*, 962 F.2d 988, 992 (10th Cir. 1992); *In re Hibble*, 371 B.R. 730, 737 (Bankr. E.D. Pa. 2007); *In re Kilgore Meadowbrook Country Club, Inc.*, 315 B.R. 412, 421-22 (Bankr. E.D. Tex. 2004).[11]

Claim No. 4524 gives notice of a claim seeking the return of Novell's $100 million investment in the debtor based on fraud. On the form, Novell listed as the total amount of its claim: "$100,000,000.00, plus interest and fees as allowed by law." As the "basis" for the claim, Novell checked the box for "Other" and next to it inserted: "Fraud [See Attachment]." Novell's

---

be determined. *See, e.g., In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *In re Pan*, 209 B.R. 152, 155 (D. Mass. 1997); *In re Circle J Dairy, Inc.*, 112 B.R. 297, 300 (W.D. Ark. 1989).

[11] More than once, the Seventh Circuit has analyzed post-bar date amendments under Rule 15. *See In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir. 1992); *In re Unroe*, 937 F.2d 346, 349 (7th Cir. 1991). And in its last word on the subject, the court took a still more restrictive view. Without disavowing a Rule 15 analysis, in *Holstein v. Brill*, 987 F.2d 1268 (7th Cir. 1993), it held that a requested post-bar date amendment to a proof of claim may be refused as untimely even when the amendment might have been permitted under Rule 15(c). *Id.* at 1270.

attachment to the form described the Purchase Agreement under which Novell paid $100 million to WH, described the USWeb merger of which Novell was allegedly not informed, and said that if Novell had known of the merger, "it never would have advanced $100,000,000.00" to WH. The attachment to the proof of claim concludes: "As a direct and proximate result of [WH's] fraud, Novell has been injured and suffered damages in the amount of $100,000,000.00, plus interest and fees as allowed by law." The narrative in the attachment plainly alleges that Novell was fraudulently induced to enter into the Purchase Agreement, and the claim plainly seeks the return of Novell's investment in the debtor. No other reading of Claim No. 4524 is reasonable or even possible.

Novell's companion claim, Claim No. 4525, bolsters this reading. As the basis for that claim, filed the same day as Claim No. 4524, Novell checked the box for "Other" and next to it inserted: "Breach of Contract [See Attachment]." In the attachment to the form, Novell described how it had entered into the Alliance Agreement with WH and said that WH had "breached its obligations under the Alliance Agreement." "[A]s a direct and proximate result" of the breach, Novell asserted that it had "been injured and suffered damages in the amount of at least $1,190,000.00." Novell thus chose to file separate claims relating to the Purchase and Alliance Agreements. That Claim No. 4525 is a claim for damages arising from WH's breach of the Alliance Agreement serves to confirm that Claim No. 4524 is a claim for damages consisting of Novell's fraudulently-induced investment in WH under the Purchase Agreement.[12]

Because Claim No. 4524 is a claim that Novell was defrauded into investing in the debtor

---

[12] Novell earlier filed two other proofs of claim, Claim Nos. 1564 and 2497, but those claims are for "goods sold" and "services performed" and do not appear to be related to the Purchase or Alliance Agreements.

and seeks the return of that investment, the claim is one for "damages arising from the purchase or sale of" a "security of the debtor" and under section 510(b) must be subordinated. *See Telegroup*, 281 F.3d at 140 (noting that Congress considered claims of fraud in the issuance of securities to be "at the core of claims" subject to section 510(b)).

To escape this seemingly inescapable conclusion, Novell advances several theories. Novell's main theory is that Claim No. 4524 is in fact a claim for breach of the Alliance Agreement. Claim No. 4524, Novell observes, not only mentions the Alliance Agreement but alleges its breach. Novell also asserts that Claim No. 4525, though based on the breach of the Alliance Agreement, is not a claim for general "expectation interest" damages but rather one for particular categories of damages stemming from the debtor's nonperformance.

Novell misconstrues its claims. Claim No. 4524 does mention the Alliance Agreement in the first paragraph of the attachment. And in the third paragraph, the attachment does assert a breach, stating that "following the closing, Marchfirst made little or no effort to meet its obligations under the Alliance Agreement." That single sentence, however, is sandwiched between others all concerned solely with the fraudulent inducement of Novell to invest $100 million in the debtor. At best, the sentence Novell highlights is a brief contractual aside (an "oh, by the way") in the midst of an extended discourse on fraud. Moreover, a proof of claim must express a creditor's "'intent to hold the estate liable,'" *O'Malley*, 252 B.R. at 456 (quoting *Gens*, 112 F.3d at 575), and Claim No. 4524 expresses no intent to hold the estate here liable for breach of the Alliance Agreement. On the contrary, in the next sentence Novell asserts it has been damaged to the tune of $100 million "[a]s a direct and proximate result of Marchfirst's fraud."[13]

---

[13] Equally unconvincing is Novell's contention that Claim No. 4525 does not seek "expectation interest" damages. The attachment to the form does itemize specific damages, as

Even if Claim No. 4524 did assert a claim for breach of the Alliance Agreement, it would have to be subordinated under section 510(b). Subordination of claims for "damages arising from the purchase or sale" of a debtor's securities is not limited to fraud claims. Breach of contract claims will also be subordinated. *See, e.g., Telegroup*, 281 F.3d at 141-42; *American Broad. Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 829-30 (9th Cir. 2001); *see also American Wagering*, 493 F.3d at 1072 (noting that the phrase "arising from" is "read broadly to encompass claims other than fraud claims, such as claims for breach of contract"). In fact, the basis of the claim is irrelevant; what matters is the damages sought. A claim to recover the claimant's "equity investment" in the debtor will be subordinated whatever the debtor's actionable conduct. *See Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2d Cir. 2006); *Telegroup*, 281 F.3d at 142; *Betacom*, 240 F.3d at 829. Claim No. 4524 seeks the $100 million Novell invested in the debtor.

Novell, though, resists this conclusion. Downplaying the significance of the $100 million figure, Novell calls it a mere "placeholder" for actual damages to be determined. This assumes, of course, that Claim No. 4524 is a claim for breach of the Alliance Agreement when it is not. But the contention that the $100 million figure is only meant to stand in for contractual damages yet to be liquidated is impossible to square with Novell's description of its claim in the attachment. Novell alleged it advanced $100 million to the debtor under the Purchase Agreement, said it would never have done so had it known of the USWeb merger, and asked for

---

Novell says. But it also says that "Novell will supplement or amend this claim as additional damages become known or liquidated." There is simply no ignoring the dichotomy Novell set up with the two proofs of claim it filed on October 11, 2001: Claim No. 4524 is a fraud claim for the return of Novell's investment under the Purchase Agreement, and Claim No. 4525 is a breach of contract claim concerning the Alliance Agreement.

damages of $100 million. The total amount of the claim on the form itself is not described as "unliquidated" but as "$100,000,000.00," Novell's investment in the debtor to the penny. The description of the claim amount as no more than a "placeholder" is not credible.[14]

Novell next argues that under the notice-pleading regime of Rule 8(a) of the Federal Rules of Civil Procedure, complaints are "liberally construed." According to Novell, Claim No. 4524 should be liberally construed as well.

Putting aside whether Rule 8(a) applies to proofs of claim, *compare DJK Residential*, 416 B.R. at 106-07 (stating it does), *with O'Malley*, 252 B.R. at 456 (stating it does not), Novell fails to say how a liberal construction of Claim No. 4524 would transform it into a claim for something other than one seeking the return of Novell's investment. The notion that pleadings should be liberally construed "has its limits." *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) (internal quotation omitted); *see also Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 151 (S.D.N.Y. 2007). A complaint must still give notice of the claim. Nor do doctrines of liberal construction ever trump a document's plain language. *Cf. In re Sauer*, 403 B.R. 722, 727 (Bankr. D. Kan. 2009) (discussing statutory interpretation). The plain language of Claim No. 4524 says Novell was defrauded into investing $100 million in the debtor and wants its investment back.

Finally, Novell contends that Claim No. 4524 gives notice of a claim for breach of the

---

[14] Late in the supplemental briefing, Novell suggests for the first time that Claim No. 4524 is not only a claim for breach of the Alliance Agreement but also for fraud in connection with that Agreement. But Novell never explains this suggestion, and nothing in the proof of claim supports it. Nowhere in the form or attachment does Novell allege it was fraudulently induced to enter into the Alliance Agreement. And even if Novell had made that allegation, the claim would have to be subordinated because the claim, regardless of its basis, is for the return of Novell's investment in the debtor.

Alliance Agreement because Maxwell himself has read the claim that way. Novell points out that in Count II of his complaint, Maxwell alleges that "[o]n information and belief, Novell alternatively describes the Claim as a claim based on misuse of the $100 million it paid to WH under the Purchase Agreement." (Compl. ¶ 69). Maxwell continues: "Any 'misuse' claim is, in essence, a claim for breach of the Debtor's obligations under the Alliance Agreement." (*Id.* ¶ 70).

These allegations do not show Maxwell had notice that Claim No. 4524 was a claim for contract damages arising from a breach of the Alliance Agreement. At most, Count II alleges – only on information and belief and apparently as an alternative to Count I – that WH misused Novell's $100 million investment and so breached the Alliance Agreement. Count II, then, also reflects an understanding that Claim No. 4524 is for the return of Novell's investment in the debtor. That Count II happens to mention a breach of the Alliance Agreement is beside the point. As discussed earlier, a claim for return of an equity investment in the debtor will be subordinated regardless of the basis on which its return is sought. Nothing in Count II of the complaint suggests that Maxwell believes Claim No. 4524 is a claim for anything other than the return of the $100 million Novell invested in the debtor under the Purchase Agreement.

Because Claim No. 4524 is a claim for "damages arising from the purchase or sale of" a "security of the debtor," section 510(b) requires subordination of the claim. Maxwell's motion for judgment on the pleadings will be granted.

### 4. Conclusion

The motion of Trustee Andrew J. Maxwell for judgment on the pleadings on Count I of his adversary complaint against Novell, Inc. is granted. A separate order will be entered in

accordance with this opinion.

Dated: June 23, 2010

_____
A. Benjamin Goldgar
United States Bankruptcy Judge